WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-15-0053-TUC-JAS (BGM) |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION** |
| v. | |
| Jesse William Holder, | |
| Defendant. | |

Currently pending before the Court is Defendant Jesse William Holder's Motion to Suppress Statements (Doc. 17). The Government filed its Response to Defendant's Motion to Suppress Statements ("Response") (Doc. 25), and Defendant filed his Reply (Doc. 30). Defendant is charged with one count of knowingly making a false and fictitious written statement to Second Amendment Sports, Inc., which was intended to deceive Second Amendment Sports, Inc., as to a fact material to the lawfulness of the sale of a firearm to Defendant, representing that he was not an unlawful user of, or addicted to, any narcotic drug or controlled substance in violation of Title 18, United States Code, Sections 922(a)(6) and 924(a)(2); and one count of knowingly making a false and fictitious written statement to Second Amendment Sports, Inc., which was intended to

deceive Second Amendment Sports, Inc., as to a fact material to the lawfulness of the sale of a firearm to Defendant, representing that he was not an unlawful user of, or addicted to, any narcotic drug or controlled substance in violation of Title 18, United States Code, Sections 924(a)(1)(A).  Indictment (Doc. 1) at 1–2.  Defendant Jesse William Holder seeks suppression of all statements made during his initial encounter with police prior to being read the *Miranda* warnings,[1] as well as all statements made at the police station, subsequent to being read his *Miranda* rights.  *See* Def.'s Mot. to Suppress Statements (Doc. 17).

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On July 23 and 28, 2015, an evidentiary hearing was held before Magistrate Judge Macdonald, and the matter taken under advisement.  Minute Entry 7/23/2015 (Doc. 48); Minute Entry 7/28/2015 (Doc. 49).  The Magistrate Judge recommends that the District Court, after its independent review, grant Defendant's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  A Robbery and Defendant's Roommate

Detective Brenda Navarro of the TPD testified  regarding the events leading up to the execution of the search warrant and subsequent questioning of Defendant Holder in this case.  *See* Hr'g Tr. 7/23/2015 (Doc. 56) 24:2–84:6.  Detective Navarro has been employed by TPD for fifteen (15) years.  *Id.* at 24:15–18.  She has been assigned to the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

robbery unit since June 2010.  *Id.* at 24:19–21, 53:18–19.  Prior to that she was a patrol officer, and worked in different areas including South Side Tucson and Midtown.  *Id.* at 53:20–22.  Detective Navarro was involved in the underlying investigation that led to the charges in the instant case.  *Id.* at 25:2–7.

On October 15, 2013, at approximately 11:23 a.m., the Tucson Police Department ("TPD") received a call to a laundromat on East Grant Road, where an individual had approached two people with a gun, and demanded their belongings, including their wallets and money.  Hr'g Tr. 7/23/2015 (Doc. 56) 26:4–11, 51:16–19.  The suspect was described as approximately 6' 2", 250 pounds, wearing a Long tee, and had tattoo "sleeves" up and down both arms.  *Id.* at 26:12–27:4.  When the suspect fled the scene, he was observed getting into the passenger side of a dark vehicle, but the driver could not be seen.  *Id.* at 28:11–18, 51:25–52:9.  As part of the investigation, TPD obtained surveillance video and still images of the robbery suspect, and released the photographs to the media.  *Id.* at 27:5–21, 51:22.  There were no images regarding the driver accomplice.  *Id.* at 28:11–18.  Subsequently, TPD received an anonymous tip that Billy McCain was the robbery suspect.  Hr'g Tr. 7/23/2015 (Doc. 56) at 27:5–21.  An arrest warrant issued for McCain, and on November 13, 2015, he was detained during a traffic stop.  *Id.*

At the time of his arrest, McCain was driving a 2006 dark-blue Mitsubishi Raider pickup truck.  *Id*. at 52:13–15.  This pickup truck was registered to Jesse Holder.  *Id.* at 52:16–18, 52:22–53:6.  It also fit the description of the pickup truck that was used in the October 15, 2015 robbery.  *Id.* at 52:19–21.  When McCain was interviewed by TPD

Detective Gamez, McCain stated that he resided at 126 East Mohave, Apartment 207, Tucson, Arizona.   Hr'g Tr. 7/23/2015 (Doc. 56) at 27:5–21.   A search warrant was obtained for this address.  *Id.* at 28:19–21, 54:4–11.   Prior to execution of the search warrant, TPD determined that Defendant Holder was the lessee of Apartment 207.  *Id.* at 29:1–5, 54:13.   Additionally, a search of the vehicle found guns and drugs.  *Id*. at 55:3–24.   The original search warrant for the apartment did not contain drug evidence, but after the vehicle search, it was amended to include the same.  *Id.* at 58:10–25.

### B.  Execution of the Search Warrant

Detective Navarro testified that there are two ways in which TPD officers may execute a warrant: 1) knocking and announcing that they are entering; or 2) asking the Special Weapons and Tactics ("SWAT") team to assist in securing the residence prior to TPD officers executing the warrant.  Hr'g Tr. 7/23/2015 (Doc. 56) 30:9–25.   In this case, Detective Navarro requested SWAT to secure the residence prior to TPD's execution of the warrant.  *Id.* at 30:9–25, 59:18–22.   The SWAT team is used for executing a search warrant when there is a potentially high risk of weapons involved.  *Id.* at 21:25–22:5. Detective Navarro testified that during the briefing, SWAT was told what had happened during the robbery, and why they were asked to help.  *Id.* at 31:5–10.

Detective Bredehoft was assigned as the senior point operator of the TPD SWAT team during execution of the warrant in this case.  Hr'g Tr. 7/23/2015 (Doc. 56) 101:15–102:25, 104:7–10.   Detective Bredehoft has been employed with TPD for approximately twelve (12) years.  *Id.*   Detective Bredehoft testified that prior to the briefing regarding the warrant, he performed a scout — a walk-through of the apartment complex, done in

- 4 -

plainclothes, to verify the address and assess any tactical considerations prior to execution of the warrant. *Id.* at 102:19–103:7. Officer Aron Lodermeier was also one of the SWAT team members called on to assist with the warrant execution. *Id.* at 7:1–9. Officer Lodermeier has been in law enforcement for approximately six (6) years, previously with TPD and now working at the Rochester Police Department. *Id.* at 6:12–22. Detective Bredehoft and Officer Lodermeier both testified that the briefing referenced a robbery, including an advisement that Defendant Jesse Holder was a suspect in the same. Hr'g Tr. 7/23/2015 (Doc. 56) 7:10–20, 102:10–18, 103:18–104:6, 116:12–19, 124:15–19. Officer Lodermeier further testified that during the warrant execution he was armed and wearing a military-style camouflage uniform, with a bulletproof vest and helmet. *Id.* at 8:11–23. Officer Lodermeier stated that other members of the entry team were similarly attired. *Id.* at 9:1–3. Officer Lodermeier's testimony was confirmed by Detective Bredehoft. *Id.* at 104:11–14. Detective Bredehoft testified that he was also carrying an AR-15 rifle, as well as a handgun. *Id.* at 104:11–105:4.

Detective Nichole Greene testified that she was also present when the SWAT team executed the search warrant. Hr'g Tr. 7/23/2015 (Doc. 56) 87:7–24. Detective Greene has been with TPD for seventeen (17) years, and was assigned to the robbery unit, as well as a hostage negotiator, at the time of the warrant execution in this case. *Id.* at 86:24–87:24. Detective Greene testified that in this particular case, her assignment was to work in conjunction with the SWAT team and use a megaphone to announce that the police department was present, and that anyone inside the target apartment was to come out. *Id.* at 88:8–89:6. Defendant Holder testified that he was in the living room of his apartment

with his mother, when he heard a woman's voice describing his address, and directing him to come out with his hands up.  *Id.* at 174:14–175:8.  Defendant's mother, Ms. Lopez, also heard the woman's voice.   Hr'g Tr. 7/28/2015 (Doc. 57) at 6:11–25. Defendant Holder further testified that he complied with this direction, and walked out his front door.  Hr'g Tr. 7/23/2015 (Doc. 56) 175:9–17.   Ms. Lopez also exited the apartment and was directed by a police officer to the medic when she informed him that she had a pacemaker.  Hr'g Tr. 7/28/2015 (Doc. 57) 7:6–23.

Detective Bredehoft estimated that there were approximately twelve (12) SWAT members on site for execution of the warrant, and explained that SWAT would set up as a containment perimeter around the house or apartment to be searched to ensure that runners did not escape.  Hr'g Tr. 7/23/2015 (Doc. 56) 105:5–22.  Detective Bredehoft further explained that the remaining operators would then make entry into the apartment and serve the warrant.  *Id.*

Officer Lodermeier testified that the SWAT team members approached the apartment from a parking lot to the north, on a sidewalk between the buildings.  *Id.* at 9:13–24.  As the SWAT team approached the building, Detective Bredehoft observed the Defendant on the upper landing, and his mother looking out of the window the apartment. *Id.* at 107:19–108:8, 117:10–22.  Defendant's mother exited the apartment and stood on the upper landing with him when she saw the SWAT team.  *Id.*  Upon approaching the stairway to the apartment, Officer Lodermeier observed two individuals standing outside of Apartment 207.  Hr'g Tr. 7/23/2015 (Doc. 56) 107:19–108:8, 117:10–22.  Officer Lodermeier testified that he verbally directed Defendant Holder down the stairs, and

physically escorted him from the landing down to the bottom.  *Id.* at 9:25–10:24, 14:12–23.  Once Defendant Holder was at the bottom of the stairs, Officer Lodermeier placed flex cuffs on him.  *Id.*  Officer Lodermeier testified that once he placed the flex cuffs on Defendant, he was passed off to another squad officer.  *Id.* at 10:25–11:7.  Detective Bredehoft testified that Defendant's mother was also ordered down the stairway, and detained.  *Id.* at 110:10–22.  Once both individuals were detained, the warrant was served, and the apartment cleared.  *Id.* at 14–25.

TPD Officer Steven Acevedo testified that he was also a member of the SWAT team involved in the execution of the search warrant.  Hr'g Tr. 7/23/2015 (Doc. 56) 127:19–128:19.  Officer Acevedo has been employed with TPD for ten (10) years.  *Id.*  On the date of the search warrant execution, Officer Acevedo was similarly attired as the other SWAT members, but armed only with a handgun, and assigned to an unmarked van.  *Id.* at 128:20–129:12.  During the execution of the search warrant, Officer Acevedo escorted Defendant Jesse Holder, and his mother, Mary Lopez, to separate areas in the front courtyard of the apartment complex.  *Id.* at 129:23–133:15.  Officer Acevedo testified that he remained with Ms. Lopez until he was relieved of duty.  *Id.* at 134:7–11.

Similarly, TPD Sergeant Richard Legarra was also a member of the SWAT team involved in the execution of the search warrant.  Hr'g Tr. 7/23/2015 (Doc. 56) 141:18–142:9.  Sergeant Legarra has been with TPD for over ten (10) years.  *Id.*  Sergeant Legarra testified that he was wearing the standard-issue gear that other members of the SWAT team were wearing, and was armed with a .40 caliber Glock handgun.  *Id.* at 143:5–19.  Sergeant Legarra first observed Defendant Holder and his mother on the

landing, and asked Ms. Lopez standard questions regarding who or what else was in the apartment.  *Id.* at 144:22–145:8.  Sergeant Legarra met Ms. Lopez at the base of the stairs and passed her on to Officer Acevedo.  *Id.* at 145:12–146:13.

TPD Officer David Ortiz was also a member of the SWAT team involved in the execution of the search warrant.  Hr'g Tr. 7/23/2015 (Doc. 56) 153:25–154:8.  Officer Ortiz has been with TPD for over ten (10) years.  *Id.*  Officer Ortiz testified that he was wearing his ACU digital uniform with tactical body armor and police patches, and either a .40 caliber handgun or AR-15 rifle.  *Id.* at 154:15–157:5.  Officer Ortiz testified that as the team approached from the north, he observed two individuals on the balcony outside of the apartment.  *Id.* at 160:14–8, 168:7–9.  The individuals were ordered off the balcony separately, made contact with the officers, and passed off to other officers in a perimeter position.  *Id.* at 163:12–166:9.

Defendant Holder testified that once he was off the staircase, he was placed in flex cuffs and led out to the parking lot by an officer.  *Id.* at 178:2–24.  Defendant was taken to the back of a moving van, and sat on its back bumper.  Hr'g Tr. 7/23/2015 (Doc. 56) 179:8–21.  One of the SWAT team members remained at the van with Defendant Holder.  *Id.* at 179:22–180:18.  The officer had his gun drawn, but pointed toward the ground.  *Id.*  Defendant Holder testified that the next officer that he had contact with was Detective Navarro.  *Id.* at 180:20–24.  Defendant's mother testified that she was not allowed contact with him during the execution of the warrant.  Hr'g Tr. 7/28/2015 (Doc. 57) 10:25–11:3.

Detective Navarro testified that for safety reasons she did not make entry, but was

approximately one block away.   Hr'g Tr. 7/23/2015 (Doc. 56) 31:16–21, 59:4–7. Detective Navarro further testified that upon approaching the apartment, she was aware that officers had a person from the apartment, as well as his mother.  *Id.* at 31:22–32:4. Detective Navarro testified that she did a quick walk-through of the apartment, and then made contact with Defendant Holder, who was waiting at the back of a police car, and in flex cuffs.[2]  *Id.* at 31:22–32:24, 76:8–10.  Detective Navarro also testified that during her walk-through, she saw "many foil-type papers with burn marks on them, which is usually indicative of some type of drug use."  *Id.* at 34:9–14, 36:1–10, 60:8–21, 66:17–67:1.

### C.  The Initial Interview

Detective Navarro testified that her initial interview with Defendant Holder took place outside of his apartment while the search warrant was being executed.  Hr'g Tr. 7/23/2015 (Doc. 56) 31:22–32:15.  Detective Navarro further testified that Defendant Holder was disheveled and dirty, and indicated that he had been up all night because he thought someone was trying to break into his apartment.  *Id.* at 36:16–37:2.  Detective Navarro also testified that Defendant Holder was able to respond appropriately to her questions.  *Id.*  Detective Navarro testified that Detective Dover was present with her during the course of the interview, but she was unable to identify any other law enforcement personnel that may have been nearby.  *Id.* at 39:21–40:12.  Detective Navarro further testified that Defendant Holder was alone, with his mother some distance away.  *Id.* at 61:5–11.  Defendant Holder remained in flex cuffs throughout the interview.

---

[2] Flex cuffs are flexible plastic handcuffs.  *See* Hr'g Tr. 7/23/2015 (Doc. 56) 10:21–24.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*See* Hr'g Tr. 7/23/2015 (Doc. 56) 31:22–32:24, 76:8–10.   Detective Navarro testified that at the conclusion of the interview, Detective Hunt approached her and informed her that Defendant Holder would be transported to the TPD station for further questioning regarding the paraphernalia found in his apartment.   *Id.* at 41:22–42:5.   The entire interview lasted approximately thirteen (13) minutes. *Id.* at 39:2–5.

During the interview, Defendant Holder stated that he was the resident of 126 East Mohave, Apartment 207, Tucson, Arizona, and that he was the only person on the lease. Case No. CR-15-0053-TUC-JAS (BGM), Exhibit "2," Audio Recording of Holder Interview at Scene (Doc. 52) at 0:59–1:40.   Defendant told Detective Navarro that he was a veteran of the Army.  *Id.* at 2:12–2:21.   Defendant also stated that he drove a dark blue Mitsubishi Raider pickup truck.  *Id.* at 2:32–2:55.   Upon further questioning, Defendant told Detective Navarro that his friend Bill was currently driving his truck, and was due back approximately an hour prior, but had not yet returned.  *Id.* at 2:56–3:37.   Defendant said that Bill's number was on his cell phone, if he needed to contact him.  *Id.*   Defendant stated that he had a couple different people staying with him previously.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "2," (Doc. 52) at 4:11–4:32.   Defendant informed Detective Navarro that Willie McCain had been staying with him for just a couple of days, and that they had met through a mutual friend.  *Id.* at 1:40–2:10,

Detective Navarro also stated that the police had walked through his apartment, and asked Defendant Holder, "What types of things that [sic] do you think we are going to find?"  *Id.* at 4:51–5:00; Hr'g Tr. 7/23/2015 (Doc. 56) 76:20–23.  Defendant responded drug paraphernalia and drugs.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "2," (Doc.

52) at 5:00–5:03.  Upon further questioning by Detective Navarro, Defendant stated that heroin was his "drug of choice" and that he smoked approximately a gram per day.  *Id.* at 5:04–6:03; Hr'g Tr. 7/23/2015 (Doc. 56) 62:15–22; 76:24–77:6.  Defendant denied that there were any guns or needles in the apartment.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "2," (Doc. 52) at 6:04–6:21.  When Detective Navarro asked Defendant if he knew why the officers were there, he indicated that he thought it was regarding an attempted robbery of his residence from the night before.  *Id.* at 7:30–57.  Detective Navarro also showed Defendant some pictures asking him if he recognized the person that appeared in them.  *Id.* at 8:00–06, 9:38–10:37.  Defendant did not immediately recognize the individual in the picture, suggesting that it looked like someone he met in the psychiatric ward of the Veterans Administration ("VA") hospital.  *Id.*  Defendant also denied knowledge of the clothing worn by the individual depicted.  *Id.*  Detective Navarro also asked if there was any reason to believe that his vehicle would have been used at the time of the pictures.  *Id.* at 10:48–11:00.  On the audio recording, Detectives Navarro and Dover can be heard discussing what to do, given that Defendant Holder could not be returned to his apartment until after the officers finished searching his apartment.  *Id.* at 11:00–11:26; 66:9–13.  Detective Dover suggested having one of the officers keep an eye on him.  *Id.*; Hr'g Tr. 7/23/2015 (Doc. 56) 65:18–66:8.  Defendant Holder was then placed in the back of a police car, and transported to the police station.  Hr'g Tr. 7/23/2015 (Doc. 56) 181:11–182:9.

### D. The Second Interview

Between approximately ninety (90) minutes and two (2) hours after the initial

- 11 -

interview, Detective Navarro interviewed Defendant Holder at the TPD station.  Hr'g Tr. 7/23/2015 (Doc. 56) 42:11–18, 67:18–20.  Detective Navarro testified that she conducted the interview, and Defendant Hunt was present, but she could not recall if he was in the room for the entire interview.  *Id.* at 42:23–43:1.  Detective Navarro further testified that when she and Detective Hunt initially entered the holding cell where Defendant Holder was sitting, he was still in the flex cuffs that had been placed on him during the execution of the search warrant at Defendant's apartment.  *Id.* at 46:15–24, 67:21–23.  Detective Hunt removed the flex cuffs and replaced them with metal handcuffs that allowed Defendant Holder to be handcuffed to the table where he was sitting.  *Id.* at 46:15–24, 67:21–68:10; Case No. CR-15-0053-TUC-JAS (BGM), Exhibit "3," Audio Recording of Holder Interview at TPD (Doc. 52) 48:52–48:56.

Initially, Detective Navarro stated that she just had some quick questions for Defendant Holder and that he "could be on [his] way as soon as we are done."  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 48:57–49:03; Hr'g Tr. 7/23/2015 (Doc. 56) 68:11–13.  After offering Defendant Holder some water, Detective Navarro informed him that officers had found the shirt that the individual was wearing in a picture that she had shown him during the previous interview.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 49:11–43.  Defendant Holder denied any knowledge about a robbery, at which point Detective Navarro stated that she needed to inform him of his rights, because he was handcuffed, not free to go, and that she intended to question him further about the individual and the shirt found in his apartment.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 49:43–55; Hr'g Tr. 7/23/2015 (Doc. 56) 68:14–

19.

Detective Navarro proceeded to give Defendant Holder his *Miranda* warnings. Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) 49:55–50:17.  Defendant Holder testified that he was familiar with the *Miranda* warnings, but chose to talk with Detective Navarro.  Hr'g Tr. 7/23/2015 (Doc. 56) 190:5–192:8.  Defendant also testified that although he knew of his *Miranda* rights, he did not believe he had a choice regarding waiver, because he thought he was going to jail and needed to let the police know what was happening.  *Id.* at 182:13–25, 194:7–195:2.  Detective Navarro asked about the other person "Willy" that had been staying with Defendant Holder.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) 50:18–27.  Detective Navarro then informed Defendant that they had already spoken to "Willy" and searched through Defendant Holder's truck.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 50:27–37; Hr'g Tr. 7/23/2015 (Doc. 56) 69:4–14.  Detective Navarro told Defendant that the more honest he was with TPD, it would help him.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 50:37–53; Hr'g Tr. 7/23/2015 (Doc. 56) 69:2–3. Detective Navarro questioned Defendant about a safe that was found in his apartment.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 50:53–51:45.  Defendant denied any knowledge about the safe beyond its presence in his apartment.  *Id.*  Detective Navarro then informed Defendant that she believed that his vehicle was used in the robbery, and they had yet to identify the driver.  *Id.* at 51:46–52:00.  Detective Navarro then questioned Defendant regarding whether or not he had driven "Willy" around town.  *Id.* at 52:01–53:46.  Detective Navarro informed Defendant that he would be charged for

the paraphernalia that they found in his house, but that they did not find any drugs.  *Id.* at 55:52–57:02.  Defendant Holder was released between 1 and 2 p.m.  Hr'g Tr. 7/23/2015 (Doc. 56) 72:5–12.

## II.     ANALYSIS

Defendant asserts that during the execution of the search warrant, he "was detained in a police dominated environment as a suspect[,] . . . was not free to leave[,] and . . . separated from the only family member present."  Def.'s Mot. to Suppress (Doc. 17) at 5.  As such, his questioning "was a custodial interrogation that required *Miranda* warnings."  *Id.*     Defendant further asserts that the mid-stream *Miranda* warnings given upon Detective Navarro's second round of questioning, represented an unlawful two-step interrogation, requiring suppression of Defendant's post-*Miranda* statements.  *See id.* at 5–9.

### A. *Miranda*

#### 1. In General

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  The Supreme Court of the United States has "recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'"  *Moran v. Burbine*, 475 U.S. 412, 420, 96 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602,

1624, 16 L.Ed.2d 694 (1966)).  "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420, 96 S.Ct. at 1140.  Specifically, the Court has found the Constitution requires "that a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him "in custody."'" *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

The Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).  This definition was refined to recognize that "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

1

## 2. In Custody

2

"Two discrete inquiries are essential to the ["in custody"] determination: first,

3

4

what were the circumstances surrounding the interrogation; and second, given those

5

circumstances, would a reasonable person have felt he or she was not at liberty to

6

terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116

7

S.Ct. 457, 465, 133 L.Ed.2d 383 (1995). The Ninth Circuit Court of Appeals has further

8

9

delineated that "[t]o determine whether an individual was in custody, a court must, after

10

examining all of the circumstances surrounding the interrogation, decide 'whether there

11

[was] a formal arrest or restraint on freedom of movement of the degree associated with a

12

formal arrest.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting

13

14

*Stansbury v. California*, 511 U.S. 318, 322, 144 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

15

The non-exhaustive list of factors considered by the court in *Kim* included: "(1) the

16

language used to summon the individual; (2) the extent to which the defendant is

17

18

confronted with evidence of guilt; (3) the duration of the detention; and (5) the degree of

19

pressure applied to detain the individual." *Kim*, 292 F.3d at 974 (citations omitted).

20

Subsequently, the Ninth Circuit Court of Appeals relied on several factors in assessing

21

22

whether an in-home interrogation was custodial, including: "(1) the number of law

23

enforcement personnel and whether they were armed; (2) whether the suspect was at any

24

point restrained, either by physical force or by threats; (3) whether the suspect was

25

isolated from others; and (4) whether the suspect was informed that he was free to leave

26

27

or terminate the interview, and the context in which any such statements were made."

28

*United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008). "[T]he initial

- 16 -

determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323, 144 S.Ct. at 1529.

It is undisputed that no *Miranda* warnings were given during Defendant's initial encounter with police at the time of the execution of the search warrant.  The testimony of various SWAT agents, Detective Navarro, Defendant, and his mother demonstrate that Defendant Holder was confronted by SWAT agents in his home, ordered out of the apartment, separated from his mother, placed in plastic restraints, questioned by Detective Navarro regarding his vehicle, another individual living in the apartment, and other individuals suspected in the robbery.  *See* Section I.B. & I.C., *supra*.  The Government asserts that he was not "in custody" for *Miranda* purposes, and that he was only physically restrained for "officer safety" purposes, and told that he was free to leave.

As an initial matter, irrespective of whether the restraints were for "officer safety purposes," the Ninth Circuit has clearly stated that "[t]he fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." *Craighead*, 539 F.3d at 1086.  Additionally, "[i]f the government is correct that the agents' actions were necessary for . . . officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the Defendant].  Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs." *Id.* (quoting *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)).  It is also irrelevant that Defendant was not a suspect in the robbery.  *See Stansbury*, 511 U.S. at

- 17 -

323, 144 S.Ct. at 1529.

Furthermore, despite the Government's attempt to distinguish *Craighead*, the Court finds it instructive.  Although, Defendant was in a "public" parking lot, he was kept separated from his mother, and he was told he could not re-enter his apartment.  Hr'g Tr. 7/23/2015 (Doc. 56) 61:5–11, 129:23–133:15, 178:2–24, 179:8–21; Hr'g Tr. 7/28/2015 (Doc. 57) 10:25–11:3.  There were numerous police officers involved in the execution of the warrant, and an officer remained with Defendant Holder with his gun drawn.  Hr'g Tr. 7/23/2015 (Doc. 56) 179:22–180:18.  Additionally, although the time of questioning was relatively brief, the flex restraints were never removed during this process.  *Id.* at 31:22–32:24, 76:8–10.  Moreover, the question which is most damaging to Defendant is his response to Detective Navarro's inquiry regarding what they will find in the apartment, which was also unrelated to evidence of the robbery.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "2" (Doc. 52) 4:51–6:03; Hr'g Tr. 7/23/2015 (Doc. 56) 62:15–22, 76:20–77:6.  The totality of the circumstances indicates that Defendant was "in custody" for purposes of *Miranda*.  As such his statements during the execution of the search warrant should be suppressed.

### 3. Mid-Stream *Miranda* Warnings

The Ninth Circuit Court of Appeals has succinctly summarized the approach taken by the Supreme Court of the United States in addressing the admissibility of a confession obtained after *Miranda* warnings have been given, but preceded by an earlier, unwarned confession, as follows:

In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985),

the Court held that a "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. 1284. However, in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), a plurality opinion, the Court distinguished *Elstad*, and concluded that "when interrogators question first and warn later," the issue "is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture?" *Id.* at 611–12, 124 S.Ct. 2601.

*United States v. Reyes-Bosque*, 596 F.3d 1017, 1031. (9th Cir. 2010).

The Ninth Circuit Court of Appeals has interpreted *Seibert* to be the narrower holding reached by Justice Kennedy — "that where law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court should suppress the confession." *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006); *see also Reyes-Bosque*, 596 F.3d at 1031. "Courts must consider circumstantial, as well as direct, evidence that the withholding of warnings is deliberate, because 'the intent of the officer will rarely be candidly admitted.'" *Thompson v. Runnel*, 621 F.3d 1007, 1016 n. 9 (9th Cir. 2007) (citations omitted). Objective evidence of a deliberate two-step strategy "would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Williams*, 435 F.3d at 1159 (citing *Seibert*, 542 U.S. at 615). The *Williams* court mandated consideration of the following: "(1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation,

(3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation and continuous with the first and (6) whether any curative measures were taken." *Williams*, 435 F.3d at 1160. Recently, the Ninth Circuit Court of Appeals reiterated the totality of the circumstances approach delineated in *Williams*, also considering the tenure of the officers involved in addition to the other *Williams* factors. *Reyes v. Lewis*, — F.3d — (9th Cir. 2015), 2015 WL 4773374 at *15–17.

"Once a law enforcement officer has detained a suspect *and subjects him to interrogation*—as was the case in *Seibert* and is the case here—there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed." *Williams*, 435 F.3d at 1159 (emphasis in original). "[T]he most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness." *Id.* (emphasis in original). "By any objective measure . . . it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.* "[A] postwarning statement must be suppressed if interrogating officers deliberately use the two-step interrogation technique that was used in *Seibert*, and if effective curative measures are not taken to ensure that the suspect genuinely understood the *Miranda* warnings." *Reyes*, — F.3d —, 2015 WL 4773374 at *13.

Subsequent to Defendant's initial questioning he was transported to the TPD station. He remained in the flex restraints from the time of the initial questioning until

- 20 -

Detective Navarro's arrival at the station, somewhere between ninety (90) minutes and two hours later, at which time he was placed in handcuffs.  Hr'g Tr. 7/23/2015 (Doc. 56) 31:22–32:24, 46:15–24, 67:21–23, 76:8–10; Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 48:52–56.  The Court finds Defendant was unequivocally "in custody" during this time.  Detective Navarro, a fifteen (15) year veteran of the TPD, questioned Defendant both pre- and post-*Miranda*.  Hr'g Tr. 7/23/2015 (Doc. 56) 24:15–18, 31:22–32:15, 42:11–18, 67:18–20.  Although both rounds of questioning were brief, the topics covered were nearly identical.  *See* Section I.C. & I.D., *supra*.  Furthermore, Defendant Holder was continuously detained, and the record is devoid of evidence of a curative instruction.  *See* Hr'g Tr. 7/23/2015 (Doc. 56) 31:22–32:24, 46:15–24, 67:21–23, 76:8–10; Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) at 48:52–56.  In fact, just prior to giving Defendant Holder his *Miranda* warnings, Detective Navarro stated that she just had some quick questions for him, and that he "could be on [his] way as soon as we are done."  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) 48:57–49:03; Hr'g Tr. 7/23/2015 (Doc. 56) 68:11–13.  Detective Navarro did not give Defendant Holder his *Miranda* warnings until after he denied any knowledge regarding the robbery.  Case No. CR-15-0053-TUC-JAS (BGM), Exh. "3" (Doc. 52) 49:04–55; Hr'g Tr. 7/23/2015 (Doc. 56) 68:14–19.

The Government relies on Defendant Holder voluntarily waiving his *Miranda* rights to assert that *Seibert* does not apply.  The Ninth Circuit Court of Appeals has rejected such an approach, however, stating:

The Court of Appeal thus addressed, and treated as dispositive, the question

whether Reyes's postwarning statement was voluntary, **which is precisely the question that is irrelevant under *Seibert*.**"

*Reyes*, — F.3d —, 2015 WL 4773374 at *14 (emphasis added). Based upon the totality of the circumstances, the Court finds that the two-step interrogation process utilized by TPD was improper under *Seibert*. 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). As such, Defendant's post-warning statements must also be suppressed.

## III.   CONCLUSION

The Court finds that TPD improperly utilized a two-step interrogation process in abrogation of *Seibert*. 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). This finding requires suppression of both Defendant's pre- and post-*Miranda* statements.

## IV.   RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court GRANT Defendant Jesse Holder's Motion to Suppress Statements (Doc. 17).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-15-0053-TUC-JAS**.

. . .

. . .

- 22 -

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 31st day of August, 2015.


_____
Honorable Bruce G. Macdonald
United States Magistrate Judge